THOMAS P. FINLEY *v.* AETNA LIFE
AND CASUALTY COMPANY
(2599)

HULL, BORDEN and SPALLONE, Js.

Argued June 13—decision released October 1, 1985

*Robert W. Heagney,* with whom were *Thomas C. Austin, Jr., Ronald Sherlock* and, on the brief, *Mark Rademacher,* for the appellant (plaintiff).

*Albert Zakarian,* with whom, on the brief, were *Felix J. Springer* and *James Sicilian,* for the appellee (defendant).

BORDEN, J. This appeal raises three issues involving employment contracts for an indefinite period: (1) whether the statute of frauds applies to this type of contract, precluding the use of evidence of oral promises made by the employer to the employee; (2) the extent to which statements contained in an employer's personnel manual can be the basis for a finding that a contract exists between employer and employee altering the traditional at will employment relationship; and (3) the extent to which a cause of action exists, based on the theory of promissory estoppel, binding the employer to promises on which the employee relied.

The plaintiff, an employee of the defendant for twenty-four years, brought suit alleging wrongful discharge after his employment was terminated following a feud among personnel in the plaintiff's

department. The complaint was in three counts. The first count alleged that the defendant had breached an express contract which it had made with the plaintiff, in oral and written statements, that the defendant would only terminate the plaintiff's employment for just cause. The second count repeated some of the language of the first count, but also alleged that, by virtue of promises made by the defendant to the plaintiff on which the defendant intended the plaintiff to rely and on which the plaintiff did rely to his detriment, an agreement was created that the plaintiff would be terminated only for just cause, and that this agreement was breached. The third count alleged that the defendant had breached an implied covenant of good faith and fair dealing in the employment contract between the parties.

The court granted the defendant's motion for a directed verdict on the second and third counts, and submitted the first count to the jury. The jury returned a verdict for the defendant. The plaintiff moved to set aside the verdict and for a new trial, requesting only that the court reverse its rulings on the second and third counts. The motion was denied. The court, in its memorandum of decision in response to the plaintiff's motion, stated that the second and third counts did not state causes of action and, furthermore, that there was insufficient evidence presented on those counts to submit them to the jury. The plaintiff appealed, claiming error in the court's charge to the jury on the first count, and in the direction of a verdict on the second count.[1]

We first dispose of the defendant's claim, raised in its preliminary statement of issues; Practice Book § 3012 (a); that the general verdict rule precludes con-

[1] In his preliminary statement of issues, the plaintiff also raised as a claim of error the directed verdict on the third count. This claim was not briefed, however, and is deemed abandoned. *Mihalek* v. *Cichowski,* 4 Conn. App. 484, 485 n.2, 495 A.2d 721 (1985).

sideration of the plaintiff's claims of error. The argument is essentially as follows: Each of the counts involved in this appeal has two issues, namely, whether a contract existed and whether the plaintiff was terminated for just cause. All of the plaintiff's claims of error relate solely to the issue of whether a contract existed and not to the issue of whether the plaintiff was terminated for just cause. Since the verdict for the defendant must be interpreted as including a finding for the defendant on the second issue, namely, that the plaintiff was terminated for just cause, the failure of the plaintiff to challenge this finding permits the verdict to stand even if the plaintiff's claims on the first issue have merit. We find this claim unpersuasive.

The general verdict rule operates to a plaintiff's detriment where there is more than one count in a complaint; *Goodman* v. *Metallic Ladder Mfg. Corporation,* 181 Conn. 62, 64–66, 434 A.2d 324 (1980); and where there is a complaint and one or more special defenses. *Stone* v. *Bastarache,* 188 Conn. 201, 204–205, 449 A.2d 142 (1982). Where, however, error is claimed "in submitting to the jury one of the specifications relating to [a] cause of action, a general verdict will not cure the error"; *Novak* v. *Anderson,* 178 Conn. 506, 508, 423 A.2d 147 (1979); or preclude this court from reviewing the error claimed. We turn, therefore, to the plaintiff's claims of error.

The plaintiff's first two claims of error arise from the charge to the jury on the first count of the complaint. Because these claims were not raised in the plaintiff's motion to set aside the verdict and for a new trial, our scope of review of these claims is limited to the plain error standard. Practice Book § 3063; *DeLorenzo* v. *Great Atlantic & Pacific Tea Co.,* 4 Conn. App. 560, 563, 495 A.2d 1106 (1985). Even under this standard, we conclude that there was error.

I

## THE STATUTE OF FRAUDS

The plaintiff claims that the court erred when it charged the jury that it was precluded, by the statute of frauds, from considering any oral promises made by the defendant to the plaintiff when deciding whether a contract existed between the parties. The plaintiff argues that this was error because the statute of frauds does not apply to employment contracts for an indefinite term. The defendant argues that the charge was correct under Connecticut law, and that any error in the instruction was harmless because no cause of action was sufficiently pleaded or proven and no oral promises were in evidence to support a contract. We agree with the plaintiff.

It is hornbook law and the law in Connecticut that "contracts of employment for personal services [of an indefinite duration] are held generally not to be within the statute, since the death of the employee, which may occur at any time, puts an end to the agreement. See notes, 35 A.L.R. 1432, 1440; 135 A.L.R. 646, 688." *Burkle* v. *Superflow Mfg. Co.*, 137 Conn. 488, 493, 78 A.2d 698 (1951); 3 Williston, Contracts (3d Ed. Jaeger) § 495; 72 Am. Jur. 2d, Statute of Frauds §§ 11, 40, 42. Even where it appears probable that the contract will extend beyond one year, if it is possible that it may be completed within one year, the agreement does not fall within the ambit of the statute of frauds.[2] *Burkle* v.

---

[2] Contrary to the defendant's suggestion, the Connecticut courts have never adopted the line of cases holding that an agreement for employment is within the statute of frauds "where there is no consideration for a contract for personal services or employment other than the promise of the employee to perform, and the purpose and intention of the parties admits of no construction permitting or contemplating complete performance or termination of the employment within a year." 72 Am. Jur. 2d, Statute of Frauds § 42.

*Superflow Mfg. Co.,* supra, 492–93; *Toussaint* v. *Blue Cross,* 408 Mich. 579, 292 N.W.2d 880 (1980); *Weiner* v. *McGraw-Hill, Inc.,* 57 N.Y.2d 458, 443 N.E.2d 441, 457 N.Y.S.2d 193 (1982).

The alleged employment contract between the parties was one for the services of the plaintiff for an unspecified time period which, while probably extending beyond one year, could have been completed within one year if, for example, the plaintiff died or became unable to work. It, therefore, did not need to be in writing and signed by the party to be charged; General Statutes § 52-550; but could be shown by evidence of oral promises. The court misstated the law when it instructed the jury that they could not take oral promises into account to determine if a contract of indefinite duration existed between the parties. This instruction constituted plain error.

The defendant's argument, namely, that any error in the instruction was harmless because no cause of action was pleaded in or proved under the first count, is without merit. The first count alleged that the parties had an express employment agreement, created at the time the plaintiff began his employment and supplemented by later written and oral commitments, that the defendant would not terminate the plaintiff as long as he performed his job satisfactorily. It further alleged that the defendant had breached this agreement by terminating the plaintiff's employment contrary to its terms. A cause of action in contract was clearly stated.[3]

---

[3] The defendant challenges the legal sufficiency of this count of the complaint, based on the general proposition that employment contracts of permanent or indefinite duration are terminable at will. See, e.g., *Somers* v. *Cooley Chevrolet Co.,* 146 Conn. 627, 153 A.2d 426 (1959). We discuss our reasons for rejecting this claim of the defendant in the next part of this opinion, captioned "THE PERSONNEL MANUAL"; see infra, p. 402; but note at this stage that this count of the complaint alleges an alteration by express contract of the plaintiff's at will employment status.

The plaintiff's claim does not purport to come within either *Sheets* v. *Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 427 A.2d 385 (1980), or *Magnan*

The record reveals that the plaintiff presented sufficient evidence from which the jury might find the allegations of an express agreement proven. The plaintiff testified that at his initial employment interview with the defendant, he was concerned about job security and discussed the terms and conditions of his employment at length with a representative of the personnel department. The issues of career advancement and longevity were discussed and the plaintiff was asked if he intended to make his work with the defendant his life's work. He replied affirmatively. Then, during his first year of employment with the defendant, the plaintiff had a conference with one of his superiors after which he believed he had a lifetime career with the defendant available to him. At about this time, the defendant was publicizing its personnel history and the fact that it did not lay off employees during the years of the great depression. The plaintiff also testified that there were other conversations with his supervisors over the next twenty-four years of employment which contained promises regarding the terms and conditions of his employment, and that he relied on those promises.

The defendant's assistant vice president in charge of personnel also testified. He stated that the defendant's personnel policies and procedures manual was accessible to all the defendant's employees and that the defendant intended, by publishing its personnel policies in such a manual, for its employees to rely on the statements in it.

The manual contained a section on involuntary terminations, which stated that it was the defendant's

v. *Anaconda Industries, Inc.,* 193 Conn. 558, 479 A.2d 781 (1984). Neither of those cases involved a claim of an express contract altering the employee's at will employment status, as does this case. They both involved claims of a breach of a covenant of good faith implied in the at will employment status, unlike this case.

policy to terminate any employee "who cannot perform satisfactorily, whose attendance is poor, or who is otherwise unsuited to his job."[4] The section also described the procedure to be followed in the event of involuntary dismissal. The next section of the manual discusses severance pay for discharged employees, and states that these benefits are not available to those terminated "for cause."

The defendant's vice president further testified that it was the defendant's policy to terminate employees only for "cause," that term being defined by the three bases for termination stated in the manual: unsatisfactory performance; poor attendance; and lack of suitability for the job. He also testified that the defendant intended the manual to inform employees of its policy, and that it was reasonable for those employees to expect to be treated in accordance with the policy.

The plaintiff was familiar with the personnel policies and procedures manual due to the various responsibilities of the positions he held with the defendant. He testified that it was his experience that the defendant generally followed the policies and procedures stated in its manual, and that employees were terminated in accordance with its procedures. His performance appraisals over the years indicated that his work was satisfactory or better. The plaintiff believed that, if the defendant followed its written personnel policies as it had done with other employees in the past, he had a

---

[4] The pertinent section on involuntary terminations or dismissals provides as follows: "It is Company policy to terminate any employee who cannot perform satisfactorily, whose attendance is poor, or who is otherwise unsuited to his job. It is the responsibility of the manager to identify such employees and to warn them that discharge will result if definite improvement is not made after a probationary period has been completed. It is recommended that a written notice be given to the employee immediately following the first discussion to avoid any possibility of misunderstanding. If the employee does not improve and a transfer to another job is not feasible, termination will then result."

position with the defendant for as long as his satisfactory performance continued, and that his employment could not be terminated solely at the defendant's will.

The plaintiff was entitled to have the jury determine, from this evidence, whether there was an agreement that the plaintiff would not be terminated without just cause or without certain procedures; see *Harry A. Finman & Son, Inc.* v. *Connecticut Truck & Trailer Service Co.,* 169 Conn. 407, 409, 363 A.2d 86 (1975); and whether that agreement was breached. The jury was precluded from properly deciding these questions by the court's erroneous instruction. This was harmful error and necessitates a new trial.

## II

### THE PERSONNEL MANUAL

The plaintiff claims that the court erred in its instructions to the jurors on the weight which they could ascribe to the defendant's personnel policy and procedures manual and on the role the manual could play in their decision as to whether a contract of employment was formed between the parties. He further claims that the court erred in declining to instruct the jury in accordance with the plaintiff's request to charge regarding the same issues. Although, like the statute of frauds issue discussed above, the plaintiff did not raise this claim in his motion to set aside the verdict, and although we found error requiring a remand on the statute of frauds issue, we also review this claim under the plain error doctrine.[5] We do so because of a coalescence of factors.

The issue is of importance to the developing law of employment contracts in this state; see *Riccio* v. *Abate,*

---

[5] For a general discussion of the cases which have, and have not, met the "plain error" test, see Moller & Horton, Connecticut Practice (8th Ed.) § 3063.

176 Conn. 415, 418 n.1, 407 A.2d 1005 (1979); and is vital to the proper resolution of the case. See *Leary* v. *Citizens & Manufacturers National Bank,* 128 Conn. 475, 479, 23 A.2d 863 (1942). The issue was presented to the trial court, both by way of a specific request to charge and an exception to the charge, even though it was not presented again in the plaintiff's motion to set aside the verdict, and was fully briefed in this court. Thus, our consideration of it does not amount to appeal by ambuscade of the trial court. See *State* v. *Wilson,* 178 Conn. 427, 436, 423 A.2d 72 (1979). Also, since it is likely to arise on the retrial, our resolution of the issue will guide the parties and trial court, and thus be in the interest of judicial economy.[6]

Neither the charge as given nor the plaintiff's request to charge was a correct statement of the law. The charge as given[7] told the jury that it could not find an

---

[6] The plaintiff also raises, in his reply brief in this court, a claim of error in the trial court's charge on the general standard to be applied by the jury in deciding whether just cause existed for the termination of the plaintiff's employment. At oral argument, the plaintiff justified raising this claim of error in this unorthodox fashion on the principal basis that the newly identified claim was made in reply to a portion of the defendant's argument in its brief on appeal.

We decline to consider this claim of error. Claims of error by an appellant must be raised in his original brief; Practice Book § 3060F; so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument. Although the function of the appellant's reply brief is to respond to the arguments and authority presented in the appellee's brief, that function does not include raising an entirely new claim of error. Also, since a new trial is required in any event, the plaintiff will have a full opportunity to present the question anew to the trial court and, in the event it is necessary, properly to preserve the issue for appeal.

[7] The challenged portion of the charge is as follows: "I further instruct you that you cannot rely solely on anything written in Aetna Life and Casualty's employment manual to determine whether the contract of employment Mr. Finley claims existed did, in fact, exist. Although there has been introduced evidence from the employment manual, there has been testimony about these pages of the employment manual, it is the law in this state that without further explicit indication from the defendant, Aetna

employment contract solely from the defendant's employment manual, without more specific indication from the defendant that an agreement existed. This charge focused the jury's eye too closely on the manual and collided with the general principle that, absent a statutory warranty or specific contract language, whether there was a contract between the parties, and the terms of that contract, are questions of fact to be determined from all the evidence. *Kakalik* v. *Bernardo,* 184 Conn. 386, 393, 439 A.2d 1016 (1981); *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.,* 183 Conn. 266, 274–75, 439 A.2d 314 (1981); *Lavigne* v. *Lavigne,* 3 Conn. App. 423, 428, 488 A.2d 1290 (1985).

The plaintiff's request to charge,[8] on the other hand, more closely approached a correct legal statement, but, in the way it was phrased, appeared to rule as a matter of law that the defendant's policies and procedures made just cause a precondition of the plaintiff's termination. This charge would also have departed from the principle that absent a statutory warranty or definitive contract language, whether there was a contract and the scope of its terms are questions of fact to be determined by the trier on the basis of all the evidence. *Kakalik* v. *Bernardo,* supra; *Bead Chain Mfg. Co.* v.

Life and Casualty Co., that an employment manual cannot form a sole basis of a contract between the plaintiff and the defendant. There must be more evidence than that presented to you."

[8] The plaintiff's request to charge was as follows: "Plaintiff claims that the personnel and appraisal policies and procedures which include the Personnel Policies and Procedures Manual and Personnel Practices make up the contractual obligations which defendant extended the plaintiff with regard to plaintiff's employment.

"Such personnel policies and procedures issued by an employer regarding aspects of the employment relation with its employees become the employer's contractual obligations when with knowledge of their existence, employees continue to work for the employer. That is, they become a contract of employment.

"The existence of such policies and procedures required the defendant to terminate its employees only for just cause and not treat its employees arbitrarily."

*Saxton Products, Inc.,* supra; *Lavigne* v. *Lavigne,* supra. Here, there was neither a statutory warranty nor definitive contract language. Thus, whether there was a contract of employment between the parties and, if so, what the parties intended the terms of that contract to be were questions of fact for the jury to decide on the basis of all the evidence produced, including the terms of the employment manual, the policies, procedures and practices of the defendant, and other relevant documents and testimony.

There is a body of decisional law which limits the effect of an employer's manual or handbook on the issue of whether an employment contract was created, altering the traditional at will employment relationship. Those cases are to the effect that an employer is not bound by statements in an employment manual purporting to limit, by reference to a standard of good cause, its right to discharge an otherwise at will employee. *Heideck* v. *Kent General Hospital, Inc.,* 446 A.2d 1095 (Del. 1982); *Shaw* v. *S. S. Kresge Co.,* 167 Ind. App. 1, 328 N.E.2d 775 (1975); *Johnson* v. *National Beef Packing Co.,* 220 Kan. 52, 551 P.2d 779 (1976); *Mau* v. *Omaha National Bank,* 207 Neb. 308, 299 N.W.2d 147 (1980); see also *Rynar* v. *Ciba-Geigy Corporation,* 560 F. Sup. 619 (N.D. Ill. 1983); note, "Protecting Employees At Will Against Wrongful Discharge: The Public Policy Exception," 96 Harv. L. Rev. 1931, 1935 (1983).

There is, however, a growing body of cases which support the general proposition that an employment manual may, under appropriate circumstances, provide a basis for a finding that an employment contract existed which limited the employer's right to discharge the employee. *Greene* v. *Howard University,* 412 F.2d 1128 (D.C. Cir. 1969); *Carter* v. *Kaskaskia Community Action Agency,* 24 Ill. App. 3d 1056, 322 N.E.2d 574 (1974); *Toussaint* v. *Blue Cross,* 408 Mich. 579, 292

N.W.2d 880 (1980); *Pine River State Bank* v. *Mettille,* 333 N.W.2d 622 (Minn. 1983); *Weiner* v. *McGraw-Hill, Inc.,* 57 N.Y.2d 458, 443 N.E.2d 441, 457 N.Y.S.2d 193 (1982); *Yartzoff* v. *Democrat-Herald Publishing Co.,* 281 Or. 651, 576 P.2d 356 (1978); *Osterkamp* v. *Alkota Mfg., Inc.,* 332 N.W.2d 275 (S.D. 1983); see also *Wagner* v. *Sperry Univac, Division of Sperry Rand Corporation,* 458 F. Sup. 505 (E.D. Pa. 1978), aff'd without opinion, 624 F.2d 1092 (3d Cir. 1980); *Morris* v. *Lutheran Medical Center,* 215 Neb. 677, 340 N.W.2d 388 (1983).

This issue has not been specifically decided by our Supreme Court. We are convinced, nonetheless, that in appropriate circumstances the law of our state permits a fact finder to find from all the evidence, including an employer's personnel policies and procedures manual, that a contract of employment existed which limited the employer's right to discharge an otherwise at will employee. Two reasons lead us to that conviction.

First, our Supreme Court, in a discussion about the "substantial erosion of the employment at will rule"; *Magnan* v. *Anaconda Industries, Inc.,* 193 Conn. 558, 563, 479 A.2d 781 (1984); has adverted to the fact that "the courts have occasionally found an implied promise to discharge only for cause in the circumstances of particular employment relationships. Sometimes the promise has been found in the representations contained in an employee relations manual or handbook." (Footnote omitted.) Id., 564. The court noted such a case as one of the "situations in which an employment contract may be found not to be terminable at will." Id., 565. Although this language is dictum, as the plaintiff concedes in his brief, we read it as a fairly clear statement of approval of the general propositions of law contained in it.

Earlier Connecticut precedent has established, in the context of death and disability benefits of an at will

employee, that written assurances of those benefits by the employer are supported by the consideration of the employee's continued service and are binding on the employer even where the writing specifically claimed the benefits to be voluntary by the employer and not contractual. *Tilbert* v. *Eagle Lock Co.,* 116 Conn. 357, 362, 165 A.2d 205 (1933). In addition, the issuance of a stock option to an employee constitutes a contract between the employer and employee, supported by the consideration of the employee's subsequent continued employment. *Ellis* v. *Emhart Mfg. Co.,* 150 Conn. 501, 505, 191 A.2d 546 (1963); see also *Dolak* v. *Sullivan,* 145 Conn. 497, 503–504, 144 A.2d 312 (1958) (employer's retirement plan constituted contract with employee, supported by consideration of employee's subsequent continued employment).

Second, although Connecticut has long followed "the general proposition that contracts of permanent employment, or for an indefinite term, are terminable at will," which do not ordinarily require a showing of just cause for termination; *Sheets* v. *Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 474, 427 A.2d 385 (1980); the cases establishing that proposition do not preclude the parties from contracting otherwise. See *Somers* v. *Cooley Chevrolet Co.,* 146 Conn. 627, 153 A.2d 426 (1959); *Fisher* v. *Jackson,* 142 Conn. 734, 118 A.2d 316 (1955); *Carter* v. *Bartek,* 142 Conn. 448, 114 A.2d 923 (1955). Those cases implicitly treat as a question of fact (1) whether the parties agreed on a contract of employment for an indefinite term, supported only by the employee's rendering of services incident to the employment, and thus terminable at will, or (2) whether they agreed on a contract for a definite term or a contract of employment supported by consideration other than the rendering of those services, and thus not terminable at will. See, e.g., *Carter* v. *Bartek,* supra, 450. We read those cases as involving "only a rule of con-

tract construction [and not as involving] a rule imposing substantive limits to the formation of a contract. *See* Restatement (Second) of Agency, § 442, comment a (inference that employment is at-will may be rebutted by specific terms of the agreement.)" *Pine River State Bank* v. *Mettille,* supra, 628. "There is no reason why the at-will presumption needs to be construed as a limit on the parties' freedom to contract. If the parties choose to provide in their employment contract of an indefinite duration for provisions of job security, they should be able to do so." Id. Whether they did so in any particular case presents a question of fact.

Thus, permitting the fact finder to assess all the evidence and decide, pursuant to proper instructions from the court, whether the parties agreed on a contract of employment limiting the employer's right to terminate the employee, is consistent with our precedents that, in the absence of "definitive contract language"; *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.,* 183 Conn. 266, 274, 439 A.2d 314 (1981); "contractual intention presents a classic question of fact." *Lavigne* v. *Lavigne,* 3 Conn. App. 423, 428, 488 A.2d 1290 (1985). The identification of that intention does no more than bring about "the fulfillment of the reasonable expectations of the parties." *Magnan* v. *Anaconda Industries, Inc.,* supra, 572.

Having gleaned from our precedents that an employment manual may, under appropriate circumstances, provide a basis for a finding of an enforceable contract limiting the employer's right to discharge the employee, we now turn to an explication of those appropriate circumstances. Those jurisdictions which have permitted recovery based on employment manuals have done so in varying ways. See, e.g., *Toussaint* v. *Blue Cross,* supra; *Pine River State Bank* v. *Mettille,* supra; *Weiner* v. *McGraw-Hill, Inc.,* supra.

We find most persuasive the analysis presented by the Minnesota Supreme Court in *Pine River State Bank* v. *Mettille,* supra. This is because it approaches what is essentially a question of contract law and contract construction from the standpoint of traditional principles of contract law.

The pertinent issues in that case were as follows: "(1) Can a personnel handbook, distributed after employment begins, become part of an employee's contract of employment? (2) If so, are job security provisions in the handbook enforceable when the contract is of indefinite duration?" Id., 625. In the following discussion, we summarize the critical holdings of that case, with which we agree. See id., 625–30.[9]

A promise of employment for an indefinite term but containing particular terms may create a binding unilateral contract, if the promise is in the form of an offer which is accepted by the employee. Id., 626. "The offer must be definite in form and must be communicated to the" employee. Id. Whether there is an offer for a unilateral contract is a question of fact to be determined by examining the conduct of the parties. "An employer's general statements of policy are no more than that and do not meet the contractual requirements for an offer." Id. Whether a statement of policy constitutes such an offer is a question of fact to be determined from the language used and all the surrounding circumstances.

If the employer's manual contained an offer which was communicated by dissemination to the employee, the employee's retention of employment may be accept-

---

[9] The only disagreement we have with the Minnesota court is that it casts some of its conclusions as conclusions of law, rather than as findings of fact for the fact finder to determine from all the evidence. We have, therefore, recast those conclusions as factual, subject to review by the court for evidentiary sufficiency, in order to be consistent with our law on issues of contract formation and construction.

ance of the unilateral contract; by remaining on the job, although free to leave, he may have supplied the necessary consideration. Id., 627. This principle is consistent with our precedents on death and disability benefits, stock options and retirement plans. *Ellis* v. *Emhart Mfg. Co., Inc.,* supra; *Dolak* v. *Sullivan,* supra; *Tilbert* v. *Eagle Lock Co.,* supra; cf. footnote 11, infra.

"[W]e do not think that applying the unilateral contract doctrine to personnel handbooks unduly circumscribes the employer's discretion. Unilateral contract modification of the employment contract may be a repetitive process. Language in the handbook itself may reserve discretion to the employer in certain matters or reserve the right to amend or modify the handbook provisions. We conclude, therefore, that personnel handbook provisions, if they meet the requirements for formation of a unilateral contract, may become enforceable as part of the original employment contract." *Pine River State Bank* v. *Mettille,* supra, 627.

The Minnesota court then turned to the specific question of "whether handbook provisions relating to job security . . . are an exception to the general rule just discussed. Put more precisely, the question is whether, in an at-will hiring, the job security provisions in a subsequently adopted employee handbook are enforceable." Id. The court recognized, as do we, that absent additional consideration beyond the rendering of the services, a claim by the employee that he was promised permanent or lifetime employment will not alter the at will nature of the employment. Id.; *Carter* v. *Bartek,* supra, 450.

Like the plaintiff in this case, "the employee [in *Pine River*] does not claim, nor could he, that he was promised 'permanent' employment. The law is hesitant to impose this burdensome obligation on an employer in the absence of an explicit promise to that effect. . . .

Instead, the . . . employee is claiming that his job termination was wrongful because the job security provisions set out in the employee handbook were not followed." (Citation omitted.) *Pine River State Bank* v. *Mettille,* supra. Similarly, the plaintiff in this case claims that his termination was in violation of binding policies and procedures of the defendant, expressed orally to him and in the employer's manual. He relies specifically on the part of the manual stating that "[i]t is Company policy to terminate any employee who cannot perform satisfactorily . . . or who is otherwise unsuited to his job," and placing the responsibility on the employee's manager to warn the employee of potential discharge "if definite improvement is not made after a probationary period has been completed." He also relies on the language of the manual that "[i]f the employee does not improve and a transfer to another job is not feasible, termination will then result," and that severance benefits are not available to employees terminated "for cause."

After examining and rejecting the reasons usually "given for the unenforceability of job termination restrictions in an employment contract of indefinite duration";[10] *Pine River State Bank* v. *Mettille,* supra, 628; the court held "that where an employment contract is for an indefinite duration, such indefiniteness by itself does not preclude handbook provisions on job security from being enforceable, whether they are

---

[10] The three reasons usually given are (1) the at will rule overrides any such restrictions on job termination, (2) there is no additional consideration supporting the restrictions, and (3) there is no mutuality of obligation. The court rejected the first and second reasons because they construe the at will rule as one of substantive law, rather than one of contract construction. *Pine River State Bank* v. *Mettille,* 333 N.W.2d 622, 628–29 (Minn. 1983). It rejected the third because "the concept of mutuality in contract law has been widely discredited and the right of one party to terminate a contract at will does not invalidate the contract." Id. 629; Restatement (Second), Contracts § 79.

proffered at the time of the original hiring or later, when the parties have agreed to be bound thereby." Id., 629–30.

We also agree with the Minnesota court's caveat that "[n]ot every utterance of an employer is binding. It remains true that " 'the employer's prerogative to make independent, good faith judgments about employees is important in our free enterprise system.' Blades, *Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise Of Employer Power,* 67 Colum. L. Rev. 1404, 1428 (1967). Properly applied, we think that the unilateral contract modification analysis appropriately accomodates the interests of the employee and the employer." *Pine River State Bank* v. *Mettille,* supra, 630. "We are mindful that courts should not lightly intervene to impair the exercise of managerial discretion . . . ." *Sheets* v. *Teddy's Frosted Foods, Inc.,* supra, 477. We conclude, nonetheless, that application of this analysis to this type of case is a useful tool in determining when intervention is or is not warranted. The failure of the trial court to use this analysis was erroneous.

The defendant argues in effect that, even if the court's instructions were erroneous, the error was harmless because (1) the general verdict rule obviates any question of whether a contract was formed, (2) the instruction only prevented the jury from relying *solely* on the manual, and the jury had other evidence before it, and (3) there was overwhelming evidence that the plaintiff's termination was in accordance with the manual. We disagree.

We have already discussed the defendant's argument based on the general verdict rule. With respect to the second argument, we note that the court had already charged the jury that they could not use the defendant's oral promises as a basis for a finding that a con-

tract existed. The charge in question here completed the circle by functionally ruling out, as well, the chief written evidence relied on by the plaintiff to establish a contract. With respect to the third argument, we note that the evidence was in conflict. The plaintiff was entitled to have a critical factual issue in the case presented to the jury pursuant to proper principles of law.

## III

### PROMISSORY ESTOPPEL

The plaintiff's final claim is that the court erred in directing a verdict for the defendant on the second count of the complaint. The court ruled that the second count did not state a cause of action and that, even if it did, the evidence was insufficient to permit that count to go to the jury. We agree with the plaintiff that the court erred.

The second count, shorn of surplusage, alleged essentially as follows: In 1952, the plaintiff entered into an employment agreement with the defendant. At that time, the defendant had expressed, in writing and orally, through its policies and practices, assurances to its employees that it offered career employment, job advancement opportunities, a hire from within policy, and other incentives designed to attract prospective employees seeking careers with the defendant. The plaintiff knew of these policies and practices when he was hired.

The second count further alleged as follows: During his twenty-four years with the defendant, the plaintiff refused other job offers and employment opportunities in reliance on the promises of the defendant that he had a career with opportunities for advancement in and retirement from the defendant as long as he performed satisfactorily. During those twenty-four years, the defendant made written and oral statements to the

effect that it wanted to retain long time employees, and that it valued experience, longevity of service and loyalty to it. To encourage employees to remain with it, it offered benefits, advancement and career opportunities, and job security to its employees.

The count concluded by alleging that, as a result of these promises and the plaintiff's detrimental reliance on them, an agreement existed between the plaintiff and the defendant in which the defendant agreed not to terminate the plaintiff as long as his job performance was satisfactory. The defendant breached the agreement by terminating him without regard to the terms of that agreement.

In deciding whether these factual allegations stated a cause of action, we read them "favorably to the pleader and view [them] in a broad fashion, not strictly limited to the allegations, but also including the facts necessarily implied by and fairly provable under them." *Schmidt* v. *Yardney Electric Corporation,* 4 Conn. App. 69, 74, 492 A.2d 512 (1985). Under this standard, the plaintiff's second count passes muster.

"For those employees not protected by collective bargaining agreements, civil service statutes or other laws, the courts have occasionally found an implied promise to discharge only for cause in the circumstances of particular employment relationships. Sometimes the promise has been found in the representations contained in an employee relations manual or handbook. *In appropriate circumstances, such an agreement may arise when an employee, in reliance on an implied representation that the position will not arbitrarily be terminated, leaves his current employment, or otherwise acts in reasonable and significant reliance on the representation.* These illustrations are not intended to encompass all of the situations in which an employment contract may be found not to be terminable at will."

(Emphasis added.) *Magnan* v. *Anaconda Industries, Inc.,* supra, 564–65. This theory of detrimental reliance on a promise is consistent with the language of *Sheets* v. *Teddy's Frosted Foods, Inc.,* supra, 475, approving, in the context of an employment relationship, "[t]he development of liability in contract for action induced by reliance upon a promise, despite the absence of common-law consideration normally required to bind a promisor; see Restatement (Second), Contracts § 90 (1973) . . . ."

The second count of the complaint stated a cause of action. It alleged that the defendant's policies, practices, and written and oral promises to the plaintiff constituted promissory representations that his employment would not be terminated except for cause related to his performance, and that, by refusing other job offers and employment opportunities, and remaining with the defendant for twenty-four years, he acted in reasonable and significant reliance on those representations.[11]

There was sufficient evidence produced by the plaintiff in support of the allegations of the second count to submit it to the jury. There was ample evidence from which the jury could have concluded that the defend-

---

[11] We note that the Supreme Court's statement that "such an agreement [to discharge only for cause] may arise when an employee, in reliance on an implied representation that the position will not arbitrarily be terminated, leaves his current employment"; *Magnan* v. *Anaconda Industries, Inc.,* 193 Conn. 558, 564–65, 479 A.2d 781 (1984); appears to depart from earlier precedent. Cf. *Fisher* v. *Jackson,* 142 Conn. 734, 737, 118 A.2d 316 (1955). ("The mere giving up of a job by one who decides to accept a contract for alleged life employment is but an incident necessary on his part to place himself in a position to accept and perform the contract; it is not consideration for a contract of life employment.") Since this case does not involve the particular factual situation of an employee leaving one job to take another, we need not attempt to resolve the apparent conflict, and leave it for another day.

ant made implied representations that the plaintiff would not be terminated except for cause related to his performance.

This evidence derives from the following: The plaintiff testified that, at his initial employment interview with the defendant, the personnel representative interviewing him asked him about making his employment there his life's work and the plaintiff made it clear that he intended to do so. The next year, the plaintiff had a conference with his superior, an assistant secretary of the claims department, which led the plaintiff to believe that he was performing satisfactorily and that he had a lifetime career available to him with the defendant. Later conversations with his supervisors contained promises regarding the terms and conditions of his employment, which led him to continue in this belief. His performance appraisals, for the most part, showed that his work was satisfactory or above satisfactory. The defendant's personnel policies and procedures manual stated regarding involuntary terminations, that "[i]t is Company policy to terminate any employee who cannot perform satisfactorily, whose attendance is poor or who is otherwise unsuited to his job." See footnote 3, supra. The manual was made available to all of the defendant's employees, and the defendant intended its employees to rely on the statements contained in it.

The evidence showing implied representations also included the following: The defendant's vice president for personnel stated that it was reasonable for the employees to expect to be treated in accordance with the manual. He also testified that it was the defendant's policy, as stated in the manual, to terminate employees only for cause, as defined by the three bases provided for in the manual. The plaintiff, who was supplied with a copy of the manual and implemented its policies himself in the course of his duties, was espe-

cially familiar with its contents. His experience was that the defendant followed its written personnel policies and procedures, namely, that employees would only be terminated in accordance with the manual, and he expected to be treated in the same manner.

There was also evidence of the plaintiff's reasonable and significant reliance on these representations. This evidence consists of his twenty-four years of service, coupled with his testimony that in reliance on those representations he remained with the defendant for that period of time and turned down other job offers which were made to him during the course of his employment.

There is error in part, the judgment is set aside as to the first and second counts of the complaint and a new trial is ordered.

In this opinion the other judges concurred.